**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ATATEKS FOREIGN TRADE LTD., et al.,**

                              **Plaintiffs,**

                    **-against-**

**CHRISTINE DENTE,**

                              **Defendant.**

---

**11-cv-01892 (ALC)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

This action arises out of a breach of contract case previously filed by Plaintiffs Atateks

Foreign Trade Ltd. and Atateks Dis Ticaret A.S. against Private Label Sourcing LLC and Second

Skin LLC.   Following a bench trial before the Honorable Harold Baer, Jr., Private Label and

Second Skin were found jointly and severally liable for Private Label's breaches of contract and

fraudulent conveyances in the amount of $1,454,996.33.   Several years later, Plaintiffs initiated

the instant action against Christine Dente, a principal of Private Label and Second Skin, seeking

to enforce the $1.4 million judgment against her under an alter ego theory, and separately for

violations of New York's Debtor and Creditor Law.   This Opinion constitutes the Court's

findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil

Procedure, following a two-day bench trial, post-trial briefing by the parties, and oral argument.

For the reasons that follow, the Court finds that Dente is not liable to Plaintiffs.

I.    **Findings of Fact**

    A.    **The Parties**

    Plaintiffs Atateks Foreign Trade Ltd. ("Atateks Jordan") and Atateks Dis Ticaret A.S.

("Atateks Turkey") are related foreign entities in the women's garment business.   ECF No. 162

(Declaration of Ihsan Arslan ("Arslan Decl.")), at ¶ 2; ECF No. 160 (Declaration of Christine

Dente ("Dente Decl.")), at ¶ 6.  Arslan is the 98.5% owner of Atateks Turkey, and, until

December 18, 2011, Atateks Jordan was a subsidiary of Atateks Turkey.  Arslan Decl. ¶¶ 1-2.

Defendant Christine Dente was one of two members of Private Label Sourcing LLC

("Private Label"), a Delaware limited liability company that operated in the garment industry as

a purchasing agent of women's apparel for retail stores.  Dente Decl. ¶¶ 2-3.  Private Label had

a contract with Atateks Jordan to manufacturer certain women's clothing items, a dispute over

which formed the basis of the prior action before Judge Baer, discussed further below.  *Id.* ¶¶ 6-

8.  Dente wound down Private Label's operations in early 2008.  *Id.* ¶ 2.  Prior to its closure,

Private Label operated out of an office in Manhattan.  *Id.* ¶ 15.

Dente also was the founder and sole member of Second Skin LLC, a New Jersey limited

liability company incorporated in 2005.  *Id.* ¶ 4.  Dente founded the company to "pursue

business sourcing seamless garments for retailers," but after she wound down Private Label's

business, Second Skin "inherited" Private Label's non-seamless garment business.  *Id.* ¶¶ 4, 14.

Second Skin had twelve employees working out of the company's office in Manhattan, at the

same address as Private Label.  *Id.* ¶ 15.  After Private Label's closure, Second Skin moved to

offices in Brooklyn, before moving back to Manhattan in 2012.  *Id.*  Second Skin filed for

bankruptcy in May 2015, but subsequently withdrew the petition in October 2015.  *Id.* ¶ 4.

Dente nevertheless wound down its operations in 2015 due to her health.  *Id.*

**B.      Plaintiffs' Previous Action against Private Label and Second Skin**

In 2007, Atateks Turkey and Atateks Jordan sued Private Label and Second Skin for

breach of contract, account stated, and fraudulent conveyance.  *See Atateks Foreign Trade Ltd.*

*v. Private Label Sourcing, LLC*, No. 07-cv-6665 (HB) ("Prior Action").  Prior to that time,

Private Label had been Plaintiffs' purchasing agent.  After the relationship soured, Plaintiffs

sued in federal court.   Their claims were based on a number of "charge backs" and costs

associated with shipping delays.   After a bench trial, Judge Baer issued a decision in which he

found that Private Label was liable for some, but not all, of the transactions at issue under a

breach of contract theory.   *See Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*,

No. 07-cv-6665 (HB), 2009 WL 1803458 (S.D.N.Y. June 23, 2009).   He also found that Dente

had caused Private Label to constructively fraudulently transfer $306,085 to Second Skin as

"commissions."   Finally, after determining that Second Skin was Private Label's alter ego,

Judge Baer pierced the corporate veil to hold Second Skin jointly and severally for the judgment.

Following Judge Baer's decision, the parties engaged in some discussions regarding

Plaintiffs' collection of the judgment.   Dente testified that discussions broke down after

Plaintiffs attempted to cut their attorney out of the deal and threatened Dente and her family.

Dente Decl. ¶ 9; ECF Nos. 171, 173 (Transcripts of Bench Trial ("Tr.")), at 146:6-147:10.

Plaintiffs do not offer any contrary version of the facts surrounding these settlement negotiations.

### C.      Dente's Compensation and Expenses

The parties have presented documentary evidence and testimony regarding Dente's

compensation from Private Label and Second Skin and the expenses Dente charged to Second

Skin between 2007 and 2012.

Between 2006 and 2011, Dente received the following compensation:

| Company | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---------|------|------|------|------|------|------|
| Private Label | $402,273 | $142,805 | $9,100 | $0 | $0 | n/a |
| Second Skin | n/a | $200,000 | $652,655 | $621,801 | $632,756 | $574,987 |
| Combined Compensation | $402,273 | $342,805 | $661,755 | $621,801 | $632,756 | $574,987 |

*See* ECF No. 161 (Declaration of Peter Lupo), Ex. 1 (Expert Opinion of Peter Lupo Regarding

Compensation of Christine Dente ("Lupo Report")), at 2.   These figures are comprised of

Dente's salary, guaranteed payments, and member distributions. *Id.* at 1.

Dente's member distributions were often paid to Dente through her use of her company credit card and petty cash. When Dente used her company credit card and petty cash to pay for personal expenses, those were accounted for in the company's books and records as member distributions. Dente Decl. ¶¶ 43-44. Dente described this as an "in kind" distribution. *Id.*

During roughly this same time frame, Dente and other Second Skin employees incurred considerable charges on their Second Skin American Express cards. *See* Pl's Exs. 147 (American Express invoices), 150 (Quickbooks Report showing Second Skin's American Express payments totaling $3,019,640.40). Plaintiffs contend that Second Skin paid for $2,091,731.41 in personal expenses that were improperly booked as business expenses.[1] These included travel, entertainment, and meal expenses where Second Skin did not have documentation of the business purpose of the trip, meal, or event; apparel; electronics; toys; spa and salon services; and pet care. Certain of these expenses appear to have no business purposes, and Dente did not provide credible explanations of their business purpose (*e.g.*, spa and hair salon services, luxury shoes). However, the Court finds that many of the other expenses that Plaintiffs deemed "questionable" are more likely business expenses, albeit without the ideal supporting documentation. For instance, while airline tickets and hotel charges may not have been accompanied by documentation regarding their business purpose, Dente testified that her work for Private Label and Second Skin required "several trips per year," during which she and her employees assessed future fashion trends, inspected and purchased raw materials, met with clients, and visited retail locations where the company's products were sold. Dente Decl. ¶¶ 19-

---

[1] Plaintiffs attribute all of these expenses to Dente, but, as described further in Part II.B.1 below, other Second Skin employees used corporate credit cards and many of the charges identified by Plaintiffs were incurred by employees other than Dente.

22.  The Court has no reason to doubt that the travel by Dente and other Second Skin employees was properly accounted as business travel.   Similarly, the Court finds it reasonable to conclude that Dente used her company credit card to purchase food, cleaning, and other supplies for the office.  *Id.* ¶ 28; Tr. 68:6-72:1 (cleaning supplies), 80:21-81:7 (electronics), 91:18-94:17 (food).

**D.      Plaintiffs' Capacity to Sue**

**1.      Atateks Turkey**

On May 4, 2007, the board of Atateks Turkey voted to require the signatures of two individuals to initiate lawsuits on the company's behalf:   (1) Ihsan Arslan and (2) either Yuksel Halacoglu or Hasan Ozturk.   ECF No. 91 (Declaration of Gorkem Ersoy ("Ersoy Decl.")), at ¶ 17, Ex. 8 (Turkish Commercial Registry Newspaper dated June 8, 2007); Arslan Decl. ¶ 4. Arslan testified that, after this board vote, he and Halacoglu gave the power to initiate lawsuits to Alp Duman.   Arslan Decl. ¶ 5, Ex. C (Power of Attorney dated May 24, 2007).   On June 7, 2007, Duman engaged counsel on Atateks Turkey's behalf to initiate the Prior Action.   *Id.* ¶ 6, Ex. D (Retainer Letter dated June 7, 2007).   Duman subsequently engaged new counsel to continue the Prior Action on March 24, 2008.   Ersoy Decl. ¶ 18; Arslan Decl. ¶ 8, Ex. E (Email dated Mar. 24, 2008).   During this time, Atateks Turkey did not report Duman's name to the Turkish Trade Registry as an authorized signatory.   Ersoy Decl. ¶ 17.

By board action dated January 30, 2008, published in the Turkish Trade Registry Gazette on February 5, the Atateks Turkey board designated Arslan as the company's sole authorized signatory.   Ersoy Decl. ¶ 18, Ex. 9 (Turkish Commercial Registry Newspaper dated Feb. 5, 2008); Arslan Decl. ¶ 10.   Arslan engaged current counsel to initiate the present action on August 10, 2011.   Arslan Decl. ¶ 9, Ex. F (Email dated Aug. 10, 2011).

### 2.   Atateks Jordan

Ala Asali, Dente's Jordanian law expert, testified that, according to the Jordanian
Ministry of Trade's official records, Atateks Jordan elected Nimatullah Sad Nish as its
authorized signatory on May 7, 2006.   ECF No. 90 (Declaration of Ala K. Asali dated May 2,
2013 ("Asali Decl.")), at ¶ 17, Ex. 5 (Companies Controller Department Certificate dated Sept.
14, 2011).   Under Jordanian law, this appointment expired after a maximum of four years.   As a
result, Nish remained the company's authorized signatory until May 7, 2010 at the latest.   *Id.*
¶¶ 10, 17-18.   Atateks Jordan did not elect another authorized signatory until August 1, 2011,
meaning that, between May 7, 2010 and August 1, 2011, Atateks Jordan had no authorized
signatory at all.   *Id.* ¶ 18.

As with Atateks Turkey, Duman engaged counsel on Atateks Jordan's behalf to initiate
the Prior Action.   *Id.* ¶ 14.   Arslan testified that he engaged counsel in the instant action for
both Atateks Turkey and Atateks Jordan on August 10, 2011 after he was selected to be the new
authorized signatory for Atateks Jordan.   Arslan Decl. ¶ 9, Ex. F (Email dated Aug. 10, 2011).
However, this case was commenced by counsel on March 18, 2011.   *See* ECF No. 1.

## II.   Conclusions of Law

### A.   Plaintiffs' Capacity to Sue

As a preliminary matter, Dente argues that Atateks Turkey did not have capacity to
initiate the Prior Action and that Atateks Jordan did not properly authorize either the Prior
Action or this action.   ECF No. 177 ("Def's Memo."), at 47-51.   While Plaintiffs implicitly
concede that Atateks Jordan was not properly authorized to initiate the Prior Action, they argue
that Dente is barred by *res judicata* from challenging their capacity to sue in the earlier case.
ECF No. 178 ("Pl's Memo."), at 42-43.   For the reasons explained further in this section, the

Court finds that, although *res judicata* precludes Dente from challenging Plaintiffs' capacity to bring the Prior Action, it does not matter because the Court finds that Atateks Turkey had capacity to initiate both this and the Prior Action.

Under the doctrine of *res judicata*, or claim preclusion (here, defense preclusion), "a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (*quoting New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). For *res judicata* to apply, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000).

Here, Dente does not contend that the Prior Action did not involve an adjudication on the merits or that the parties to the Prior Action are not in privity with the parties in this case. Instead, Dente appears to focus on the third element—that Private Label and Second Skin did not raise, but also could not have raised, the affirmative defense of Plaintiffs' capacity to sue. She argues that *res judicata* is not applicable if there is "fraud affecting the prior litigation." ECF No. 180 ("Def's Reply"), at 64. However, she does not state, or even suggest, what that fraud might be. She notes only that "there was nothing that was said or done by the Atateks Plaintiffs that would indicate there was a question about corporate authorization." *Id.* This, without more, does not constitute a fraud that should excuse Second Skin and Private Label's failure to raise the affirmative defense in the Prior Action. *See E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 936 (2d Cir. 1998) (lack of capacity is "waived if not specifically raised"). Dente is therefore bound by their failure.

7

Even if this issue were not *res judicata* as to the Prior Action, the Court still would find that Atateks Turkey had capacity to initiate that lawsuit. Capacity to sue and be sued is governed by Rule 17 of the Federal Rules of Civil Procedure, which, in turn, directs the Court to the law of the state of incorporation. *See* Fed. R. Civ. P. 17(b)(2). Turkish law permits only authorized signatories to initiate lawsuits, Ersoy Decl. ¶¶ 9-12, but, at the time the Prior Action was initiated, Alp Duman was so authorized. The board of Atateks Turkey required a combination of two signatures: (1) Ihsan Arslan and (2) either Yuksel Halacoglu or Hasan Ozturk. *Id.* ¶ 17, Ex. 8; Arslan Decl. ¶ 4. After the board authorized these three men, Arslan and Halacoglu gave the power to initiate lawsuits to Duman, who then retained a law firm and commenced the Prior Action. Arslan Decl. ¶¶ 5-6, Exs. C-D.

Dente asserts that this delegation to Duman was not proper under Turkish law. Def's Memo. at 50. However, her Turkish law expert did not precisely make that assertion. Rather, Ersoy testified that an individual can become an authorized signatory if he is "*given that power by the authorized signatory or a proper vote of the board of directors.*" Ersoy Decl. ¶ 14 (emphasis added). Ersoy did not specifically discuss the circumstances presented here, where the authorized signatories grant the authority to another individual. Based on his recitation, however, it seems that such actions are allowed under Turkish law, and, accordingly, the Court finds that Dente has failed to meet her burden to prove that Atateks Turkey did not authorize Duman to initiate the Prior Action.[2] There seems to be no question that Arslan was properly authorized to bring the instant action in 2011.

Jordanian law similarly limits the ability to initiate lawsuits to authorized signatories who

---

[2] Additionally, in Turkey, corporations must report the names of all authorized signatories to the Trade Registry. Ersoy Decl. ¶ 15. Atateks Turkey did not report Duman as an authorized signatory. However, Ersoy did not assert that this, alone, would invalidate any legal actions taken by Duman.

must be reported to the Ministry of Trade. Asali Decl. ¶¶ 9, 11. When Atateks Jordan began

the Prior Action, only Nimatullah Sad Nish was authorized to bring lawsuits on Atateks Jordan's

behalf, but Duman took action. *Id.* ¶¶ 14, 17. When this case was filed in March 2011, the

company had no authorized signatory at all. *Id.* ¶ 18. Plaintiffs do not make any arguments to

counter Dente's proof that Atateks Jordan lacked capacity to bring this suit.[3] They only note

that, in December 2011, Atateks Jordan assigned its rights in these cases to Atateks Turkey.

Pl's Memo. at 42; Arslan Decl. ¶¶ 2-3. However, that assignment is of no import if Atateks

Jordan did not have a properly-instituted case to assign. Accordingly, the Court need not

address the parties' disagreement about whether the assignment by Atateks Jordan was valid

under Jordanian law as there is evidence demonstrating this suit was not properly authorized by

Atateks Jordan. *Compare* ECF No. 86 (Declaration of Ala K. Asali dated June 6, 2014), *with*

ECF No. 164 (Declaration of Alaa M. Qattan). The Court finds that Dente has met her burden

to prove that Atateks Jordan does not have capacity to bring this action.

## B. New York Debtor and Creditor Law

Plaintiffs allege five cause of action under the New York Debtor and Creditor Law

("DCL"), all of which relate to conveyances made by a person that, as a result of certain

circumstances, are deemed fraudulent. Am. Compl. ¶¶ 19-46. A conveyance made "without

fair consideration" will be considered fraudulent where it is made by: (1) someone "who is or

will be thereby rendered insolvent," § 273; (2) a defendant in an action for money damages or

with a judgment against him where "the defendant fails to satisfy the judgment," § 273-a; or

---

[3] Plaintiffs also do not counter Dente's proof regarding Atateks Jordan's capacity to bring the Prior Action.
However, as discussed above, Dente is precluded from raising that defense. Even if Dente could make that
argument, the Prior Action resulted in a judgment in favor of both Plaintiffs and, therefore, the determination
about whether Atateks Jordan had capacity to bring the Prior Action would not impact the remainder of the
Court's decision here.

(3) someone who would be left with "unreasonably small capital" after the conveyance, § 274. A conveyance made with actual intent to defraud is fraudulent regardless of the fairness of the consideration. N.Y. DCL § 276.[4] As is clear from the statutory requirements, the parties' debate largely centers on whether the payments Dente received from Second Skin constitute fair consideration for the work she performed. Because the Court finds that Plaintiffs have not met their burden to prove that payments from Second Skin to Dente were made without fair consideration, the Court need not address the other elements of DCL §§ 273, 273-a, or 274. The Court also finds that Plaintiffs have not proven that Dente acted with actual intent to defraud. Therefore, the Court finds in favor of Dente on Plaintiffs' DCL claims.

### 1.     Fair Consideration

With respect to DCL §§ 273, 273-a, and 274, Plaintiffs argue that much of the money Dente received from Second Skin constitutes payment without fair consideration. These payments can be divided into three categories: (1) Dente's salary; (2) Dente's member distributions; and (3) Dente's reimbursed expenses. For the reasons that follow, the Court finds that Plaintiffs have not met their burden to prove by a preponderance of the evidence that payments from Second Skin to Dente were made without fair consideration.[5]

---

[4] Plaintiffs also assert a cause of action under DCL § 278 and the parties brief this provision as if it creates a substantive claim. See Am. Compl. ¶¶ 41-46; Pl's Memo. at 24-26; Def's Memo. at 46-47. However, this section only provides the remedy for fraudulent conveyances under the other provisions of the DCL for creditors whose claims have matured: the creditor may either "[h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim" or "[d]isregard the conveyance and attach or levy execution upon the property conveyed." N.Y. DCL § 278(1). It is not a separate cause of action. See 30 N.Y. Jur. 2d Creditors' Rights § 435 ("The Debtor and Creditor Law gives creditors whose claims have matured specific rights or remedies.") (citing § 278); Tube City IMS, LLC v. Anza Capital Partners, LLC, No. 14-cv-1783 (PAE), 2016 WL 5864887, at *3 (S.D.N.Y. Oct. 6, 2016) ("[T]he law also provides for turnover to a creditor of money or property held by a third party which a debtor had fraudulently conveyed to that party.") (citing § 278). Because the Court finds that Plaintiffs' are not entitled to recover under any of the substantive provisions of the DCL, the Court will not separately address their claim under § 278.

[5] The burden of proof under the constructive fraud provisions remains somewhat unresolved, with New York State Courts requiring proof by clear and convincing evidence and New York federal courts most often requiring proof by a preponderance of the evidence. See Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp., No. 04-cv-4971 (NG)

10

Section 272 of the DCL provides that "fair consideration" is given for property:

> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

From this definition, courts have explained that "the concept of fair consideration has two components—the exchange of fair value and good faith," both of which are required. *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376-77 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). The existence of fair consideration is evaluated on a case-by-case basis. *Id.* at 377.

### a. *Dente's Compensation*

First, Plaintiffs take issue with Dente's compensation as reported by her. According to Dente's compensation expert Peter Lupo, Dente received the following compensation— comprised of salary, guaranteed payments, and member distributions—between 2006 and 2011:

| Company | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| Private Label | $402,273 | $142,805 | $9,100 | $0 | $0 | n/a |
| Second Skin | n/a | $200,000 | $652,655 | $621,801 | $632,756 | $574,987 |
| Combined Compensation | $402,273 | $342,805 | $661,755 | $621,801 | $632,756 | $574,987 |

*See* Lupo Report at 2. Lupo concluded that this compensation "was not excessive in comparison" to the amounts paid to other chief executive officers at companies with comparable annual revenue—less than $75 million. *Id.* at 5. In particular, he determined that Dente's average compensation during these years fell within the compensation for CEOs at companies with revenue between the 25th percentile and the median of the less than $75 million bracket; that is, companies earning approximately $18-33 million. *Id.* at 3-4. Lupo also stated that he

---

(MDG), 2011 WL 2414685, at *8 (E.D.N.Y. June 8, 2011) (discussing split). The Court need not decide which standard is correct because Plaintiffs' claims fail under either standard.

views a ±15% variance within the normal, competitive range. *Id.* at 3. While during three years (2008-10), Dente's compensation exceeded the median, in only one year was it significantly above the 15% variance (2009), and, even then, it still remained below the 75th percentile. *Id.* at 4.

Plaintiffs do not provide their own compensation expert, or take issue with Lupo's analysis. Rather, they argue that Lupo's conclusions regarding the propriety of Dente's compensation are based on inapt comparators because Second Skin and Private Label did not have annual revenues near $25 million during the relevant time period. Pl's Memo. at 19-21. Plaintiffs get Second Skin's revenue numbers from the "gross receipts or sales" line on Second Skin's tax returns, which does not exceed $5.5 million during the relevant years. *See* Pl's Ex. 121-123 (2008-10 tax returns); Def's Ex. N (2011 tax return).

However, Plaintiffs gloss over the distinction drawn by Dente at trial. Both she and the company's accountant explained that the "gross receipts or sales" reported on Second Skin's tax returns represent "gross factored receipts"—that is, gross receipts from the company's factors— not gross sales. Tr. 5:20-8:23 (Dente); 176:1-177:18 (Huber). Because of the way Private Label and Second Skin financed their purchases, after the goods were shipped to the customer, the bank, called a "factor" under these circumstances, "owned the receivables and received payments on behalf of those goods." *Id.* 6:3-5 (Dente); *see also* FACTORING, Black's Law Dictionary (10th ed. 2014) ("The buying of accounts receivable at a discount."). The amount reported as "gross receipts or sales" on the tax returns was the "net amount received by Second Skin for their services in expediting those sales to [the] end markets," which was equal to 8% of the total sale. Tr. 177:1-3 (Huber). At trial, Dente testified that the total sales numbers were reflected in Second Skin's general ledger and invoices. *Id.* 9:1-18.

In Plaintiffs' post-trial briefing, they assert in conclusory fashion that the general ledger does not reflect approximately $25 million in average sales annually, but do not explain the basis on which they make this assertion by, for example, identifying what they believe the actual gross sales number is based on the general ledger. Pl's Memo. at 20. Their factually-flawed argument regarding Second Skin's tax returns is their only point as to Second Skin's revenues. The Court therefore rejects that contention.

### b.   *Dente's Member Distributions*

Plaintiffs also contend that Dente's member distributions were not fair consideration for services rendered because, by definition, distributions are payments for ownership rather than services rendered. Pl's Memo. at 19. Plaintiff's argument misses the mark and ignores the testimony of Lupo and Huber, both of whom deemed it appropriate to consider these member distributions as part of Dente's compensation. Lupo Report at 1; Tr. 177:19-178:6 (Huber). Moreover, Lupo expressly included the member distributions when calculating Dente's total compensation. And, for the reasons just discussed, the Court finds that Dente's reported total compensation was not so outside the bounds of the market to necessitate the conclusion that it was not fair consideration.

### c.   *Dente's Reimbursed Expenses*

Finally, Plaintiffs devote the bulk of their argument to what they contend are Dente's personal expenditures paid by Second Skin   Plaintiffs assert that, between July 2, 2007 and September 20, 2012, Second Skin reimbursed $2,091,731.41 in personal expenses that Dente did not acknowledge as member distributions. Plaintiffs reached this sum by determining which charges on Dente's American Express card they deem "questionable" ($2,595,671.81), and subtracting from that, the amount that Second Skin has no record of paying ($240,661.80) and

the amount Dente declared as member distributions ($263,278.60). *See* Pl's Memo. at 7 n.13.[6]

This calculation rests on several flawed assumptions. First, as a clerical matter, Plaintiffs designated as "questionable" many expenses that seem to have been incurred by other Second Skin employees using their own credit cards tied to Second Skin's American Express account. Dente testified that she was not the only Second Skin employee with a company credit card. Tr. 116:12-13. For instance, the American Express bill dated January 20, 2012, contains charges incurred on credit cards held by Dente, as well as cards in the names of Nilda Corchado, Lisa Burke, David Talley, and Stanley Walden.[7] In that January 2012 bill, Plaintiffs designated more than $9,000 of expenses as "questionable" that were charged by someone other than Dente. Pl's Ex. 147 at 2-26. On the final bill in the record, dated October 19, 2012, there are eight people incurring charges besides Dente, who collectively charged approximately $39,000 that Plaintiffs deemed "questionable." Pl's Ex. 147 at 120-59. While the Court has not tallied the amounts attributable to these other employees among the nearly 7,000 individual expenditures that Plaintiffs identified as problematic, it is not an insignificant percentage of the total.

Second, in some instances, Plaintiffs also appear to be including charges that subsequently were credited back to the American Express card. For instance, an October 20, 2011 bill shows that Dente's card was credited $950 on August 22, 2011 in a transaction described as a refund, but this August 22 "charge" nevertheless appears on Plaintiff's demonstrative exhibit of the questionable expenses. *Compare* Pl's Ex. 147 at 64 (Oct. 20, 2011

---

[6] Plaintiffs also assert that Dente incurred $1,051,531.64 of personal expenses on her corporate Bank of America debit card, which amount they reached by determining which expenses in the Bank of America account "were not counted as member distributions," and "eliminate[ing] those expenditures that appeared to be clearly for business purposes." Pl's Ex. 152 (demonstrative exhibit of "questionable" debits); ECF No. 163 (Declaration of Richard Millett), Ex. A (Declaration of Charlotte Christopher), at ¶ 12. These expenses suffer from the same issues identified with respect to the American Express charges.

[7] During the trial, Dente identified Talley as a Second Skin employee. Tr. 20:17-20.

bill), *with* Pl's Ex. 148 at 105 (showing $950 charge dated Aug. 22, 2011). While the other credits on this particular bill designated by Plaintiffs as questionable do not appear in Plaintiff's demonstrative exhibit as questionable charges, this apparent error gives the Court concern regarding the accuracy of Plaintiffs' calculation.

Third, and more broadly, Plaintiffs are asking the Court to rely on their assessment of which expenses are and are not business related. Time constraints precluded Plaintiffs from asking Dente about each expenditure, but many of the expenses they found "questionable," that they chose not to ask Dente about, seem very likely to be business related. For example, Plaintiffs identified a number of travel-related expenses, including airline tickets for individuals other than Dente or her family. Some of the people for whom the travel was purchased also had Second Skin credit cards, suggesting to the Court that these individuals were Second Skin employees. *See, e.g.*, Pl's Ex. 147 at 47 (airline ticket for Dente, Heather Krentsel, and Lisa Burke), 68-69 (airlines charges for Nilda Corchado). Without further factual development or argument by Plaintiffs regarding these expenditures, the Court cannot conclude that they were improperly accounted as business travel expenses. The lack of back-up documentation identifying the particular business purpose of the trip is not enough, on its own, for the Court to conclude that the travel was for pleasure. The Court is not prepared to accept Plaintiffs' general argument that these expenses should be deemed personal because they "appear unlikely on their face to be business expenses" and Second Skin did not provide records "showing the business purpose of the expense." Pl's Memo. at 7.

Moreover, for the expenses that Plaintiffs questioned Dente about at trial, the testimony is far from conclusive that they were all Dente's personal expenses. Dente credibly testified that she purchased office supplies, including cleaning supplies and food, both near her home in New

15

Jersey and near Second Skin's offices in New York City. *See, e.g.*, Tr. 68:6-72:1 (cleaning supplies), 80:21-81:7 (electronics), 91:18-94:17 (food). Whether she should have been stocking her refrigerator at home with food purchased for her company merely because she worked from home is a different question. Dente also testified that because she and her employees worked very long hours, she "allow[ed] them to have -- order food, dinner, etc., lunch, anything that it required to get the job done." *Id.* 72:11-22. The Court has no reason to doubt Dente's explanation of these expenses. The question of whether it made good business sense to allow Second Skin employees to charge so many meals to the company is beyond the scope of the Court's review.

Dente only confirmed three categories of expenses—pet care, shoes, and hair salons— that should have been credited as her personal expenses. *Id.* 49:9-13, 122:15-123:2, 132:14-19. While the Court agrees with Plaintiffs that certain other categories of expenses—travel for Dente's husband and son, and spa services—also were not properly categorized as business expenses, notwithstanding Dente's contention that she viewed these as proper business expenses under certain circumstances, they are not so excessive that they render Dente's total compensation unfair consideration for her services to Second Skin, which were extensive.

## 2. Section 276

Section 276 of the DCL provides that "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Plaintiffs have the burden to prove actual intent "to hinder delay, or defraud" by clear and convincing evidence. *In re Zerbo*, 397 B.R. 642, 649 (Bankr. E.D.N.Y. 2008) (citing *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994)).

Because direct proof of fraudulent intent is difficult to find, courts look for certain "badges" of fraud, including: "1) gross inadequacy of consideration; 2) a close relationship between transferor and transferee; 3) the transferor's insolvency as a result of the conveyance; 4) a questionable transfer not in the ordinary course of business; 5) secrecy in the transfer; and 6) retention of control of the property by the transferor after the conveyance." *Lippe*, 249 F. Supp. 2d at 375 (S.D.N.Y. 2003) (citing, *inter alia*, *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994)); *accord In re Zerbo*, 397 B.R. at 649 (also considering chronology of events and transactions).

Here, evaluating the presence or absence or the various badges of fraud, the Court finds that Plaintiffs have not proven by clear and convincing evidence that Dente had the intent to hinder, delay, or defraud Second Skin's creditors by her conduct. Although there is a very close relationship between transferor (Second Skin) and transferee (Dente) as a result of Dente's 99% ownership of the company, for the reasons discussed in the previous section, the consideration paid to Dente was not grossly inadequate nor were many of the transfers outside the ordinary course business. Moreover, many of the expenses identified by Plaintiffs were incurred by other Second Skin employees. This somewhat dampens Plaintiffs' argument that the transfers to Dente, in particular, were "secret" because personal expenses were disguised as business expenses in Second Skin's books and records. Pl's Memo. at 27. While Second Skin's liabilities exceeded its assets at the time Dente and others at Second Skin were incurring costly travel and meal expenses, there does not appear to have been a shift in the nature or extent of reimbursed expenses following Plaintiffs' judgment in the Prior Action. Nor have Plaintiffs demonstrated that Second Skin's insolvency was "a result of" these expenditures. Viewed in their totality, the Court finds that these expenses are more appropriately attributed to poor

business decision-making than fraud.

## C.  Alter Ego Theory

Plaintiffs style their final, remaining cause of action as an "alter ego claim."  *See* Am. Compl. ¶¶ 47-50.   While "alter ego" is not an independent cause of action, it is clear that Plaintiffs intend, by this claim, to pierce Second Skin's corporate veil to hold Dente liable for the judgment entered against Second Skin by Judge Baer in the Prior Action.   For the reasons that follow, however, the Court finds that it is not appropriate to pierce Second Skin's corporate veil to reach Dente.

"A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state," *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012), and, in New York, "[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders," *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (citation omitted).   Second Skin was incorporated in New Jersey, *see* Def's Ex. C (Certificate of Incorporation dated June 3, 2005), and therefore the Court will apply New Jersey's alter-ego jurisprudence, not New York law, as both parties assumed.

Piercing the corporate veil is "an equitable remedy designed to remedy a fundamental unfairness perpetrated under the guise of the corporate form."   *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 679 (D.N.J. 2009) (citing *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500 (1983)).   It is an exception to the rule that "a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise."   *Ventron Corp.*, 94 N.J. at 500.   In New Jersey, the party seeking to pierce the corporate veil has the burden of proving that:   "(1) one corporation is organized and

18

operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002); *accord Ventron*, 94 N.J. at 500-01. Both prongs of this test must be proven by clear and convincing evidence. *Canter v. Lakewood of Voorhees*, 420 N.J. Super. 508, 519 (App. Div. 2011).

With respect to the first element, "courts engage in a fact-specific inquiry considering whether the subsidiary was grossly undercapitalized, the day-to-day involvement of the parent's directors, officers and personnel, and whether the subsidiary fails to observe corporate formalities, pays no dividends, is insolvent, lacks corporate records, or is merely a façade." *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 200 (App. Div. 2006) (citing *Foodtown*, 296 F.3d at 172). In connection with the second element, "the hallmarks of that abuse are typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof." *OTR Assocs. v. IBC Servs, Inc.*, 353 N.J. Super. 48, 52 (App. Div. 2002). A "plaintiff need not prove common law fraud but instead demonstrate that the defendants, via the corporate form, perpetrated a fraud, injustice, or the like, a less exacting standard." *State Capital Title & Abstract*, 646 F. Supp. 2d at 679 (citation and internal quotation marks omitted). Here, Plaintiffs have failed to adduce clear and convincing evidence that Dente used Second Skin as her alter ego to an unjust end.

On the first prong, although some of the factors might suggest domination by Dente, when viewed in totality, the Court finds that Plaintiffs have not demonstrated that Second Skin was her mere instrumentality. Therefore the Court need not reach the second prong of the test.

19

Second Skin may have been insolvent within the meaning of New York's Debtor and Creditor Law, but the inquiry into capitalization for purposes of piercing the corporate veil is different. Undercapitalization means "capitalization very small in relation to the nature of the business of the corporation and the risks . . . attendant to such businesses. . . . Adequate capitalization is a question of fact that turns on the nature of the business of the particular corporation." *Verni*, 387 N.J. Super at 200 (citation and internal quotation marks omitted) (distinguishing adequate capitalization from solvency). Here, both Dente and Second Skin's accountant testified that the company had adequate assets for the type of business in which it was engaged. Tr. 14:24-15:4 (Dente) (describing Second Skin as a "going concern"), 178:19-179:5 (Huber) (same). Indeed, Second Skin continued to operate, albeit sometimes at a net loss, until 2015. *See* Dente Decl. ¶ 39.

Further, while Dente testified that she is the company's 99% owner and "didn't keep minutes of [her] own meetings with [herself]," this seeming failure to observe corporate formalities may be attributable to the overall size of the company. *Id.* 23:16-20. The fact that a corporation is closely-held does not, on its own, justify piercing the corporate veil. *State Capital Title & Abstract*, 646 F. Supp. 2d at 679-80; *Canter*, 420 N.J. Super. at 520. Nor do Dente's expenditures, alone, provide a sufficient basis for the Court to pierce Second Skin's corporate veil. While Plaintiffs struggled to untangle Second Skin's general ledger, and Second Skin may not be the picture of detailed record-keeping, it also cannot be said that the company lacked corporate records. Nor can it be said that Dente ran Second Skin exclusively, or even primarily, as a vehicle to fund her personal expenses. The evidence at trial showed that Second Skin was, in fact, a real entity, with an office filled with employees engaged in a real business. The evidence does not support the conclusion that Dente created or operated Second Skin as

mere façade.   Therefore, the Court declines to pierce Second Skin's corporate veil.

## CONCLUSION

For all of the foregoing reasons, the Court finds that Plaintiffs have not proven their entitlement to a judgment in their favor on any of their causes of action.   The Clerk of Court is respectfully directed to enter judgment in accordance with this Opinion and close this case.

**SO ORDERED.**

Dated: September 22, 2017
      New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**